IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 30, 2011

## STATE OF TENNESSEE v. TOBIAS SENTER, a/k/a TOBY SENTER

**Direct Appeal from the Circuit Court for Cocke County**
**No. 0411      Ben W. Hooper, II, Judge**

_____

**No. E2010-02092-CCA-R3-CD - Filed October 6, 2011**

_____

The defendant, Tobias Senter, a/k/a Toby Senter, was convicted by a Cocke County Circuit Court jury of first degree premeditated murder and sentenced to life imprisonment, to be served consecutively to a life sentence imposed by a federal district court. On appeal, he challenges the sufficiency of the evidence and the trial court's imposition of a consecutive sentence. After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

Bruce E. Poston, Knoxville, Tennessee, for the appellant, Tobias Senter, a/k/a Toby Senter.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; James B. Dunn, District Attorney General; and James B. Dunn and W. Brownlow Marsh, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The defendant and co-defendant, Edward Leon Talley, were charged with first degree premeditated murder and conspiracy to commit first degree premeditated murder[1] arising out of the killing of the victim, Michael Grimes, in April 2007 and disposing of his body in a field near Interstate 40 in Cocke County, Tennessee.

_____

[1] It appears that the defendant was only tried on the first degree murder charge.

**State's Proof**

Franklin Davis, Jr. testified that in April 2007, he was looking for arrowheads in a field near Interstate 40 in Cocke County when he discovered what appeared to be a body lying on the ground. He called a friend who met him at the field and confirmed that it was a body. They called 911 and waited for the police to arrive.

Darrell Henderson testified that in April 2007, his friend, Franklin Davis, Jr., called him because he thought he had found a body in a field and was "freaked out." Henderson met Davis and confirmed that it was a body. The two men called 911 and waited for the police to arrive.

Special Agent Forensic Scientist Denise Morrissey with the Tennessee Bureau of Investigation ("TBI") Crime Laboratory testified that she is the leader of the Violent Crime Response Team, a group within the TBI that assists local agencies in investigating major crimes. On April 11, 2007, Agent Morrissey and her team were called to a location in Cocke County "off of O'Neal Road around Mile Marker . . . 439." At the scene, the team located the body of the victim and a single tan Timberland boot nearby. Some distance away, they also observed reddish-brown stains on the side of a tree close to the Pigeon River and the other boot about halfway down the bank of the river.

The parties agreed to the following stipulation:

[A] silver Nissan Maxima was seized on April 11, 2007, and it was impounded for two days. And then on the 13th of April, 2007, it was put on a wrecker and taken to the Crime Lab in Nashville, Tennessee. And it was processed then on or about April the 27th, 2007, by the Crime Lab in Nashville.

Special Agent Forensic Scientist Patrick Ihrie in the DNA and Serology Unit of the TBI Crime Laboratory testified that he examines biological evidence, namely blood, semen, and saliva, to determine the contributors of the evidence. In April 2007, Agent Ihrie examined a 2004 Nissan Maxima associated with this case. He found areas of blood in the car, including two areas of blood on the carpet on the front passenger side floorboard, which he tested. Agent Ihrie determined that the DNA from the blood on the carpet matched the victim. Agent Ihrie also tested blood on the right boot collected from the crime scene as well as a bloodstain from the tree, and the DNA on both matched the victim. Agent Ihrie tested blood on a towel found in the car, and it was consistent with a mixture of two people. However, the victim was excluded as a possible contributor of that blood.

-2-

Detective Robert Caldwell, Chief Detective of the Cocke County Sheriff's Department, testified that he responded to an isolated field off O'Neil Road around 2:30 p.m. on April 11, 2007, regarding the discovery of a body. Detective Caldwell identified the body in the field as the victim. Detective Caldwell was aware that the victim had been missing.

Travis Stewart testified that he knew both the victim and the defendant. On Thursday, April 5, 2007, Stewart was at Freddy's Bar when the defendant entered the establishment and tried to choke him. Stewart fought back but eventually agreed to go outside with the defendant. When Stewart got outside, the defendant, who was standing beside a light-colored car, pulled a gun on him and told him to get in the car. Stewart got in the car in the backseat on the passenger's side. He recalled that the defendant was driving and two other individuals were also in the car.

Stewart testified that the defendant drove to various locations while questioning him about the whereabouts of the victim, whom he referred to as "Mikey," and Gregory Thomas, whom he referred to as "Frog." The defendant said that the victim and Thomas had stolen something from him, which Stewart later learned to be money. Stewart told the defendant that he did not know where to find the victim. Stewart clarified that only the defendant asked the questions.

Stewart testified that the defendant eventually drove to "The Slab" restaurant because the defendant had heard Thomas lived nearby. Although the victim knew where Thomas lived, he did not tell the defendant. When Stewart failed to provide any information, the man sitting next to him in the backseat began punching him. The defendant eventually stopped the vehicle, they all got out of the car, and Stewart "took a beating." Stewart elaborated that the men kicked and punched him in the neck and back. However, he did not bleed, suffer any broken bones, or require stitches. Stewart told the men that he needed to go to the restroom and ran. He called his girlfriend, and she picked him up near The Slab. Stewart later learned that the victim and Thomas had stolen money from the defendant.

Stewart testified that he saw the victim on Saturday morning, April 7, 2007, at the victim's grandmother's house and told him that the defendant, Leon Talley, and a third man were looking for him. Stewart saw the victim later that day at a gas station and advised him that he should leave town. The victim asked why he needed to leave, and Stewart told him "it was over money." The victim asked Stewart if the defendant and his associates were "serious," and Stewart told him that "they meant business."

On cross-examination, Stewart admitted that his April 11, 2007 statement to Detective Fraley noted that Stewart did not know who the two men were with the defendant

even though he, in fact, knew Leon Talley. However, Stewart explained that "[he] thought that [he] had told them [he] knew Leon Talley was in the car[,]" and he did not read the statement before signing it. Stewart also admitted that he told Detective Fraley in his statement that in February 2007, he and Thomas stole twelve ounces of cocaine from the defendant, and he sold his share in approximately a week. However, Stewart said that his share was actually stolen. He also said that "[he] know[s] that [he] could not sell no six ounces in about a week's time." Stewart stated that "[a]t the time, [he] didn't want to get Mr. Thomas into anything," but he agreed that he had already implicated Thomas.

Kaden Haney, who was thirteen years old at the time of the incident, testified that he knew the defendant and saw him at the victim's house on Easter Sunday of 2007. The defendant was on the front porch of the victim's house, and Haney asked him a question. The defendant told Haney, "Go on right now. This is grown man business." Haney saw the victim exit the house, get into the backseat of the car the defendant was driving, and leave. He also saw someone in the front passenger's seat of the car but did not recognize him. Haney acknowledged that no one was screaming or yelling.

Terrence Davidson, who was fifteen years old at the time of the offense, testified that he saw the defendant at the victim's house on Easter Sunday of 2007. Davidson saw the victim exit his house and talk to the defendant, whom he knew as "T-Mack." Davidson saw a car drive off, but he did not see who was driving or if the victim got into the car.

Dr. Darinka Mileusnic-Polchan, Chief Medical Examiner for Anderson and Knox Counties, testified that Dr. Jeff Johnson, a forensic pathologist, performed the autopsy on the victim and prepared a report. Dr. Mileusnic-Polchan reviewed Dr. Johnson's report and the slides and photographs taken during autopsy.

Dr. Mileusnic-Polchan stated that the victim's cause of death was a gunshot wound to the head. She explained that the bullet entered the victim's head from the left side and slightly toward the back. The bullet perforated the victim's brain and continued downward into the neck. The bullet, which was recovered in the victim's upper neck muscle, was a slightly deformed, medium-caliber, copper-jacketed bullet. She hypothesized that the victim was shot from a distance of at least two or three feet.

Dr. Mileusnic-Polchan noted that the victim also had bruises and abrasions on his face, arms, and legs. A cluster of post-mortem abrasions on the victim's torso, abdomen, chest, and back looked like "brush burn" or a dragging injury. Blunt force trauma to the side of the victim's head was consistent with having been hit with an object.

Glenda ("Tina") Cate testified that she saw the defendant at Bear Pruitt's house on the evening of Easter Sunday 2007. The defendant offered to give her drugs in exchange for sex, and they "had words." Later, around 1:30 a.m., the defendant and two girls woke Cate up, and the defendant asked her to follow him to the interstate. When they got outside, the defendant, who was "high," grabbed Cate on the buttocks, and she told him to stop. Cate hit the defendant and noticed what appeared to be blood on his shoulder under his jacket.

Cate testified that she got in her car and followed the defendant to the interstate. She saw the defendant throw something resembling a brown paper bag out his window. She explained that she drove directly behind the defendant so no one could see his license plate. Cate then returned to Bear Pruitt's house. She gave a statement to police on April 11, 2007; however, she acknowledged that she did not mention in her statement that the defendant had thrown something out the window. She explained that she never mentioned it previously because she had lupus and "it just slipped [her] mind."

TBI Agent Greg Monroe testified that, in March 2007, he was investigating the defendant regarding the defendant's drug activities. As part of that investigation, he sought and obtained an order from a federal judge to place a tracking device on a silver Nissan Maxima. The device was temporarily removed following an accident, then replaced on March 31, 2007 by Agent Monroe and Jim Marcum, an investigator with the Knoxville Police Department. Agent Monroe later downloaded information from the device, placed it on a disc, and gave it to Investigator Marcum. On cross-examination, Agent Monroe acknowledged that he was aware of an instance when someone other than the defendant had driven the car.

Investigator Jim Marcum of the Knoxville Police Department's Organized Crime Unit testified that, in March 2007, he and Agent Monroe placed a tracking device on a gray or light-colored Nissan Maxima. He explained that the device worked like a GPS unit and stored the locations traveled to in its memory. Investigator Marcum later received information downloaded from the device by Agent Monroe. The information showed, among other things, that, on April 8, 2007, the vehicle traveled from a location on White Oak Avenue in Newport to a location off O'Neil Road near Interstate 40 where the victim's body was found, and it stopped there for "a couple minutes." The car resumed travel and returned to O'Neil Road at 7:07 p.m.

Hope Hastings testified that she was traveling westbound on Interstate 40 near Newport around 7:00 p.m. on April 8, 2007, which was Easter Sunday. She observed a light-colored car in a field, and two people dragging something "large and heavy looking." Likewise, Cliff Hastings testified that on April 8, 2007, he and his wife, Hope, were driving home to Knoxville from South Carolina. Around 7:00 p.m., they were on Interstate 40 near

Newport. Mr. Hastings saw a silver or light-colored Nissan Altima or Maxima in a field, and two people "carrying something that looked heavy."

Todd Douglas testified that sometime on or around April 6, 2007, the defendant told him that he had been robbed and that Gregory Thomas, Travis Stewart, Sheena Coggins, who was the defendant's girlfriend, and the victim were responsible. On Monday, April 9, 2007, the defendant and Leon Talley came to his house. Douglas and the defendant talked alone in Douglas' bathroom in the basement, during which the defendant said that he shot "him" in the head. Douglas asked to whom he was referring, and the defendant said, "The agent's boy." Douglas assumed the defendant meant the victim because the victim's uncle was an agent. The defendant told Douglas that the shooting occurred "up on the river." Douglas assumed "up on the river" referred to Keith Hicks's residence because Hicks lived on the river.

On cross-examination, Douglas admitted that he was presently in federal custody because he was involved in a drug conspiracy along with the defendant. He also admitted that, by the time he talked to the authorities with regard to the present case, it was common knowledge that the victim had been shot in the head and found by the river. Douglas acknowledged that he told the authorities when he was arrested that he would only talk about the homicide of the victim and not anything related to drugs.

Edward Leon Talley, the co-defendant, testified that he pled guilty to facilitation of first degree murder in this case and would be sentenced to fifteen to twenty-five years, served at thirty percent, at a later date. He acknowledged that he had other prior felony drug convictions and was currently serving a ten-year federal sentence at eighty-five percent. He admitted that his sentence for the present offense could possibly run concurrently with his federal sentence.

Talley testified that he had known the defendant since they were young. In April 2007, he was staying at the defendant's house, but he did not have a key to the house. On Thursday, April 5, 2007, Talley arrived home to find the back door to the house unlocked and the window open. Talley went inside and called the defendant to tell him that the back door was unlocked. The defendant told Talley that he would be home shortly.

Talley testified that, meanwhile, Sheena Coggins, the defendant's girlfriend, arrived with her mother. Coggins called the defendant and told him that she believed someone had been in the house because some of her jewelry was missing. When the defendant arrived, he discovered that $75,000 was missing from his bedroom. The defendant and Coggins went into the defendant's bedroom to talk about the missing money. When they emerged, the defendant told Talley that Coggins had tried to implicate Talley in the theft, but the

defendant did not believe her.

Talley testified that the following night, Friday, he and the defendant went to Freddy's Bar in Newport. The defendant was driving a Nissan Maxima, and Talley was sitting in the front passenger's seat. Talley remained in the car, while the defendant went inside the bar. The defendant returned with Travis Stewart, who sat in the backseat. According to Talley, Stewart got into the car willingly. Talley did not recall anyone else being in the car with them.

Talley testified that the defendant drove around looking for Gregory Thomas, while asking Stewart where to find him. Stewart told the defendant that he did not know Thomas' location, "but he thought he knew where his baby's mama stayed[.]" Talley stated that the defendant believed Stewart, Sheena Coggins, Gregory Thomas, and the victim were involved in the theft. Talley said that neither he nor the defendant hit, punched, or threatened Stewart the entire time. At some point, Stewart said that he needed to use the bathroom, so the defendant pulled over. Stewart got out of the car and ran. The defendant and Talley circled the block, but, unable to find Stewart, they returned to the defendant's home.

Talley testified that on Easter Sunday, April 8, 2007, he went with the defendant to Bear Pruitt's house in Cocke County for four or five hours. Around 6:00 or 7:00 p.m., they left to go look for the victim. They learned that the victim's grandmother lived on White Oak Avenue and went to her house. The defendant knocked on the door and asked if the victim was there. The victim came outside and talked to the defendant in the front yard for a few minutes. The victim went back in the house briefly, came outside, and willingly got in the backseat of the car behind the defendant, who was driving.

Talley testified that the defendant drove around and questioned the victim about the break-in at the defendant's house and about how to get in touch with Thomas. The victim responded that he had nothing to do with the break-in at the defendant's house and that he did not know how to get in touch with Thomas or where he was located. The defendant drove to a field known as the "bean patch" and told the victim to get out of the car. The victim got out of the car, and the defendant hit him with a nine-millimeter gun and said, "I'm going to teach you all about stealing from me." The defendant then shot the victim. Talley estimated that the shooting occurred around 6:30 or 7:00 p.m. and noted that they could see the interstate from the field.

Talley testified that, after the shooting, the defendant rolled the victim over and told Talley to grab him by the legs. The defendant grabbed the victim's upper body, and they moved the victim "next to a tree down by the river." They then returned to the car and left

-7-

the scene. He estimated that they were in the bean patch only two or three minutes. Talley recalled that the defendant had said, when they were leaving the house earlier that day, "that if he found anybody who . . . got his money that he was going to take care of them."

Talley testified that the defendant put the gun on the floorboard on the passenger's side, where it remained until they stopped at a vacant store down the street from Sheena Coggins' parents' house. The defendant took the gun, wrapped it in the floor mats, and put it in the trunk of the car. The defendant told Talley that "he was going to get rid of the gun, the clothes, everything." They picked up Coggins at her parents' house and then went to the defendant's house. Talley could not explain how blood got on the carpet under the floor mat if the gun was lying on the floor mat.

Talley noted that the defendant's gun was black and gray, even though he said in his statement to police that the defendant had a blue gun. Talley explained the discrepancy by saying, "As time goes on, your memory gets better." Also, confronted with his statement in which he told the police that he refused to help the defendant move the victim's body so the defendant had to do it himself, Talley explained, "Just at the moment . . . I was just trying to cover myself." Asked about the time he and the defendant went to Todd Douglas' house, Talley stated that he was with the defendant and Douglas throughout the entire visit and they did not talk about the shooting.

**Defendant's Proof**

The defendant acknowledged that he was a drug dealer, that he had prior felony drug convictions, and that he was serving a life sentence in federal prison. He said that he came to court to clear his name because he was not a murderer.

The defendant testified that, at the time of the murder, Leon Talley was living at his house and "selling dope for [him]." The defendant was dating Sheena Coggins, who had previously dated Gregory Thomas. Coggins was aware that the defendant sold drugs and often saw the money.

One day, the defendant and Coggins went to Morristown and returned home to discover that $75,000 had been stolen from his house, some of which he needed to pay his suppliers. The defendant said that Coggins tried to blame Talley for the theft, but the defendant did not believe her. Instead, he thought that Gregory Thomas, Travis Stewart, the victim, and Coggins were responsible.

The defendant admitted that he interrogated Travis Stewart on April 6, 2007, but said that he was only trying to find out about his missing money and did not strike or threaten

Stewart. He said that he located Stewart at Freddy's Bar, and Stewart willingly got into the car with him.

The defendant testified that on Easter Sunday, April 8, 2007, he was driving his uncle's gray Nissan Maxima and Leon Talley was with him. At the victim's house on White Oak Avenue, the defendant knocked on the door and talked to the victim. The victim went back inside to get dressed, then got in the car with the defendant and Talley. During the drive, the defendant questioned the victim about his money, "trying to coerce him into telling me that I know he got my money." However, the victim said "he ain't got nothing. He heard [Thomas] and [Coggins] did it." The defendant also asked the victim where Thomas lived, but the victim did not tell him.

The defendant testified that he wanted to know who took his money and where it was located, so he drove to a field by the river to interrogate the victim. He explained that he wanted to get the victim in unfamiliar territory as a "[f]ear tactic." The defendant said that he stopped the car, and all three men got out of the vehicle. He continued to question the victim, and the victim responded that he heard it was Coggins and Talley who committed the theft. According to the defendant, Talley then "hit [the victim], cocked the hammer, and shot him." He said that he did not do anything because he was "in shock."

The defendant testified that he and Talley picked up the victim's body and moved it a short distance, placing it on an incline. The defendant said that he cursed at Talley for killing the victim and was angry because he was not going to be able to retrieve his money. The defendant said he had no intention of hurting the victim and only wanted his money returned.

The defendant testified that, after disposing of the victim's body, he drove away from the scene. They had only been in the field a brief amount of time. He said that he stopped at Coggins' house so Talley could take off his shirt, wrap up the gun, and throw it in a trash can at an abandoned store. The defendant denied personally wrapping the gun in a floor mat, explaining that there were no floor mats in the car.

The defendant admitted to having guns at his home but said that none of the guns were ever linked to this crime. He also admitted that he had been "ripped off" of large sums of money in the past, which made him "[d]isappointed" in those people.

After the conclusion of the proof, the jury convicted the defendant as charged of first degree premeditated murder.

# ANALYSIS

## I. Sufficiency of the Evidence

The defendant challenges the sufficiency of the convicting evidence, arguing that "[i]t was at least equally plausible that [Leon] Talley killed [the victim]" and that the State did not prove the element of premeditation. When the sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

First degree murder is "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1) (2006). "Premeditation" is defined in our criminal code as

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d).

Whether premeditation exists in any particular case is a question of fact for the jury to determine based upon a consideration of all the evidence, including the circumstantial evidence surrounding the crime. See State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Facts from which the jury may infer premeditation include the defendant's declaration of an intent to kill the victim; the use of a deadly weapon upon an unarmed victim; the establishment of a motive for the killing; the particular cruelty of the killing; the infliction of multiple wounds; the defendant's procurement of a weapon, preparations to conceal the crime, and destruction or secretion of evidence of the killing; and the defendant's calmness immediately after the killing. State v. Jackson, 173 S.W.3d 401, 409 (Tenn. 2005); State v. Thacker, 164 S.W.3d 208, 222 (Tenn. 2005); State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004); State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000); Bland, 958 S.W.2d at 660.

In the light most favorable to the State, the evidence was sufficient for a rational trier of fact to find beyond a reasonable doubt that the defendant killed the victim after the exercise of reflection and judgment. The evidence shows that the victim's body was found in an isolated field near Interstate 40 in Cocke County on April 11, 2007. The medical examiner determined that the victim had died from a gunshot wound to the head. The medical examiner also noted that the victim had post-mortem abrasions on his mid-section consistent with a dragging injury, as well as blunt force trauma to the side of the head consistent with having been hit with an object.

Leon Talley, the co-defendant in this case, testified that $75,000 was stolen from the defendant's house, and the defendant believed that the victim, Travis Stewart, Gregory Thomas, and Sheena Coggins were responsible for the theft. The day after the theft, the defendant and Talley went to a local bar where the defendant found Travis Stewart, who got into the car with them. The defendant drove around while questioning Stewart about how

-11-

to find Thomas. Stewart eventually got out of the car and ran.

On Easter Sunday, April 8, 2007, the defendant and Talley located the victim at the victim's grandmother's house on White Oak Avenue and, after talking to the defendant, got into the Nissan Maxima the defendant was driving. The defendant drove around and questioned the victim about the missing money and how to find Thomas, but the victim did not provide any information. The defendant then drove to a field known as the "bean patch" and told the victim to get out of the car. The victim got out of the car, and the defendant hit him with a nine-millimeter gun and said, "I'm going to teach you all about stealing from me." The defendant then shot the victim. Talley helped the defendant move the victim's body closer to the river, and they left the scene. The defendant put the gun on the passenger's side floorboard and later disposed of it.

Travis Stewart testified about the defendant's driving him to various locations while questioning him about how to find the victim and Thomas. Stewart escaped and later told the victim he needed to leave town because the defendant was looking for him and he "meant business." Todd Douglas testified that, prior to the murder, the defendant told him that he had been robbed and that the victim was involved. The day after the murder the defendant told him that he had shot "[t]he agent's boy" in the head "up on the river." Douglas assumed the defendant meant the victim because the victim's uncle was an agent.

Two witnesses, Kaden Haney and Terrence Davidson, saw the defendant talking to the victim at the victim's house on White Oak Avenue on Easter Sunday 2007. Haney saw the victim get into the defendant's car. Tina Cate saw the defendant the evening of Easter Sunday 2007 and noticed that he had blood on his shirt. Later that night, she followed the defendant to the interstate, staying directly behind him so no one could see his license plate. Cate observed the defendant throw something out the window.

A tracking device on the Nissan Maxima the defendant was driving showed that the car stopped at a location on White Oak Avenue the evening of April 8, 2007, and then traveled to the field where the victim's body was discovered. The car left the field at 7:07 p.m. Two witnesses, Hope and Cliff Hastings, were traveling westbound on Interstate 40 near Newport around 7:00 p.m. and observed a light-colored car in a field and two men carrying something that appeared heavy. The Nissan Maxima was seized following the murder. TBI Agent Patrick Ihrie located areas of blood on the passenger's side floorboard of the car. The blood matched the victim.

The defendant admitted that he believed the victim had stolen money from him and interrogated him about the theft on Easter Sunday 2007. However, the defendant claimed that it was Talley who shot the victim after the victim suggested that Talley had committed

-12-

the theft.

The jury heard all of the evidence, including the defendant's assertion that it was Talley who shot the victim, and obviously accredited the testimony of the State's witnesses instead of that of the defendant, as was its province. In addition, as outlined above, the State presented sufficient evidence to establish the element of premeditation, including a motive for the killing, the defendant's declaring to the victim that he was "going to teach [him] about stealing from [him]," shooting an unarmed victim, moving the body, and disposing of the gun.

## II. Sentencing

The defendant also challenges the trial court's order that his life sentence be served consecutively to his federal life sentence.

The trial court conducted a sentencing hearing at which Janea Grimes, the victim's sister, read a statement prepared by their mother, Renee Hannon. In the statement, Hannon said that her son's death had changed her family forever. She explained that the victim was "just beginning to experience life . . . [and] treated everyone with respect." She asked that the defendant take responsibility for his actions, noting that his life had been spared and he still had the opportunity to change.

TBI Agent Greg Monroe, who was also a member of the Federal Drug Task Force, testified that he was the lead agent in a federal drug conspiracy investigation involving the defendant. The investigation began in the spring or summer of 2006 and concluded in April 2007. Agent Monroe testified that the criminal acts for which the defendant was convicted in federal case number CR3-07-42 were committed prior to the day of the victim's death, Easter Sunday 2007. During the course of his investigation, Agent Monroe became familiar with the defendant's background and history and noted that, to his knowledge, from 2006 to 2007, the defendant did not have any gainful employment other than selling controlled substances. Agent Monroe acknowledged that the defendant had not been arrested or on bond on the federal charges at the time the victim was killed.

The State discussed a sentencing memorandum it had previously filed with the court. The State argued that Tennessee Rule of Criminal Procedure 32(c)(B)(2) required that the defendant be sentenced consecutively because he had an unserved federal sentence, unless the court found good cause for running the sentence concurrently. The State also asserted that the defendant was a professional criminal and persistent offender within the meaning of Gray v. State, 538 S.W.2d 391 (Tenn. 1976).

In sentencing the defendant, the court adopted the sentencing memorandum submitted by the State "as being supportive of the Court's decision." The court noted that the defendant qualified as a professional criminal and a persistent offender. The court also noted that "under all these circumstances that [it] would have to consider and find [the defendant] to be [a] dangerous [offender]." The court observed that even though the defendant was given a life sentence in the federal system, he "move[d] up in the seriousness and the severity of the offense[.]" The court concluded that "it would destroy respect for the law in this community" if "an act of murder [was] diluted by running it concurrently with [the defendant's] federal sentence."

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record "with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2006). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000).

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statistical information provided by the administrative office of the courts as to Tennessee sentencing practices for similar offenses, (h) any statements made by the accused in his own behalf, and (i) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210 (2006); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401 (2006), Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169.

Tennessee Rule of Criminal Procedure 32(c)(2)(B) provides:

If, as the result of conviction in another state or in federal court, the defendant has any additional sentence or portion thereof to serve, the court shall impose a sentence that is consecutive to any such unserved sentence unless the court determines in the

exercise of its discretion that good cause exists to run the sentences concurrently and explicitly so orders.

This court has previously observed that the "shall" language in the rule "connotes a requirement that the [d]efendant's state and federal sentences run consecutively to each other, absent 'good cause' to order otherwise[,] [and] places a finding of 'good cause' solely within the discretion of the trial court." State v. Darrin Toni Webb, No. E2006-00736-CCA-R3-CD, 2007 WL 642071, at *6 (Tenn. Crim. App. Mar. 5, 2007).

We conclude that the trial court did not abuse its discretion in ordering consecutive sentencing. It is apparent from the trial court's findings at the sentencing hearing that it did not find good cause for sentencing the defendant concurrently. Foremost, the court adopted the sentencing memorandum of the State, which asserted that the sentences should run consecutively unless good cause was shown for concurrent sentencing and also that the defendant was a persistent offender and a professional criminal. The memorandum alleged the defendant's numerous prior convictions and at least two revocations of probation. The evidence shows that the defendant admitted to making his living as a drug dealer and that he had no gainful employment other than selling drugs – at least during the time he was under federal investigation. The court observed that the defendant was sentenced in the federal court for a drug offense, but then "move[d] up in the . . . severity of the offense" by committing first degree murder. Even if the trial court failed to find the Wilkerson factors regarding the defendant's being a "dangerous offender" under Tennessee Code Annotated section 40-35-114(b)(4), such does not make consecutive sentencing erroneous in this case.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE

-15-